UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 25-62146-CIV-SINGHAL

PUBLIX SUPER MARKETS, INC. and
PUBLIX SUPER MARKETS INC. GROUP
HEALTH BENEFIT PLAN.,

Plaintiffs,

vs.

ABA CARES OF FLORIDA, LLC,
d/b/a ABA CENTERS OF FLORIDA
(o/b/o Jane and John Doe Members #1-10),
and ABA CENTERS OF GEORGIA, LLC,

Defendants.
_______________________________________/

**ORDER**

**BEFORE THE COURT** is a civil case that could also be brought as a criminal action. Plaintiffs—an employer and an insurance plan—allege that healthcare provider Defendants committed insurance fraud. Plaintiffs allege that Defendants submitted inflated bills to Plaintiffs and intended Plaintiffs to calculate the amount owed under the insurance plan based off the inflated amounts, even though Defendants never intended to collect significant portions of those totals from the employee Plan Members who received treatment. For example, if Defendants submitted a bill for $1,000 for a 15-minute appointment, and the insurance plan required Plaintiffs to pay 60% and Plan Members to pay 40%, Defendants would only collect the $600 from Plaintiffs and then a *de minimis* amount from Plan Members. The $1,000 billed total was false—Defendants only intended to collect a little over $600. What Defendants wanted was for Plaintiffs to believe they

owed $600 and pay that amount, thinking that Plan Members were also going to pay their required portion of these bills. The Plan Members, of course, never raised an issue with the bills since they did not have to pay. Plaintiffs paid almost the entirety of what Defendants collected, when they should have paid far less. Plaintiffs allege fraud. The Court has not been advised as to whether there is a concurrent criminal case pending.

In Florida, "[a] person commits insurance fraud punishable as provided in subsection (11) if that person, with the intent to injure, defraud, or deceive any insurer [p]resents or causes to be presented any written or oral statement as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy . . . knowing that such statement contains any false, incomplete, or *misleading* information concerning any fact or thing material to such claim." Fla. Stat. § 817.234(1)(a). As Plaintiffs allege the facts, Defendants submitted bills with misleading information, intending Plaintiffs to believe that was the total Defendants would collect when Defendants were actually collecting a significantly lower amount. Before the Court is Defendant's Motion to Dismiss (DE [49]) Plaintiff's Amended Complaint (DE [9]).

## I. <u>BACKGROUND</u>

Plaintiffs are employer Publix Super Markets, Inc. ("Publix") and insurance plan Publix Super Markets, Inc. Group Health Benefit Plan (the "Plan"). (DE [9] ¶ 1). Publix provides insurance for its employees through the Plan. *Id.* The Plan uses third-party administrator Blue Cross Blue Shield of Florida ("Blue Cross") to accept, review, and process claims and billing information from both Plan members and healthcare providers. *Id.* ¶ 2. Blue Cross also issues payments to Plan members and healthcare providers, according to the terms of the Plan. *Id.*

Defendants ABA Centers of Florida, LLC ("ABA Florida") and ABA Centers of Georgia, LLC ("ABA Georgia") (collectively "ABA Centers") are for-profit healthcare providers that specialize in Applied Behavior Analysis therapy for autism. *Id.* ¶ 1, 4. ABA Florida and ABA Georgia each "controls all material aspects of its behavioral therapy businesses, including claims submissions and billings." *Id.* ¶ 5. But each Center is part of a larger association with multiple members and affiliates, self-described as a "vertically integrated behavioral healthcare organization." *Id.* ¶ 6. The ABA Centers are out-of-network providers under the Plan, meaning that Plan Members are responsible for paying the bills themselves and then seeking reimbursement through the Plan. *Id.* ¶ 14. Under the Plan, Plan Members can get reimbursed up to 60% of their healthcare bills. *Id.* ¶ 14 n.4. The Plan calculates how much it owes Plan Members based on the ABA Centers' reported billed charge that ABA Centers submits electronically. *Id.* ¶ 15, 99. ABA Centers knows and intends that the Plan use the billed charge amount to calculate payment, and ABA Centers knows the Plan expects ABA Centers to collect the full billed amount from the Plan Member. *Id.* ¶ 16. s

But ABA Centers does not collect the billed amount from Plan Members. Instead, each ABA Center declines to collect money from Plan Members, or only collects a *de minimis* amount. *Id.* ¶ 17. This incentivizes Plan Members to seek services with ABA Centers, because even though ABA Centers is out-of-network, Plan Members pay almost nothing for their services. *Id.* Instead, *Plaintiffs* pay for almost the entirety of the services. *Id.* Instead of collecting from Plan Members through copays, co-insurance, deductibles, and the difference between the Plan's payment and the reported charged amount, ABA Centers only seek to meaningfully collect from Plaintiffs. *Id.* ¶ 18. Not only do ABA

Centers never meaningfully collect from Plan Members, but also ABA Centers never intend to do so. *Id.* ¶ 19.

For example, on February 20, 2023, ABA Florida provided services to Member 1 and submitted a bill for $5,160.00. *Id.* ¶ 20. According to the Plan, the allowed charge—60% of the billed charge—was $3,096.00. *Id.* Member 1 had a coinsurance payment of $838.40 and a deductible of $1,000.00, which further reduced the amount of the allowed charge for which the Plan was responsible to $1,257.60. *Id.* But Plan Member 1 paid nothing. *Id.* ¶ 21. ABA Florida accepted as full payment the $1,257.60 paid by the Plan. *Id.* ¶ 20 n. 4; ¶ 21.

And that was just the beginning of the game. The Plan then updated to show that Plan Member 1 had exhausted her deductible and had made a coinsurance payment, so Plan Member 1's payment amount for future services dropped, and the Plan's payment amount increased. *Id.* ¶ 22. The Plan credited the deductible and co-insurance payment to Plan Member 1's out-of-pocket maximum, even though Plan Member 1 had not yet paid anything. *Id.* The Plan also calculated its financial obligations based on its understanding that ABA Florida was also collecting the non-allowed amount from Plan Member 1. *Id.* This pattern continued until it appeared from the Plan's perspective that Plan Member 1 had reached her out-of-pocket maximum, at which point the Plan paid the full allowed amount. *Id.* But again, Plan Member 1 had paid nothing, at ABA Florida's insistence.[1] *Id.* ¶ 22, 69. ABA Florida assured Plan Member 1 they would "never have to pay anything out of pocket." *Id.* ¶ 69.

---

[1] ABA Florida submitted over $800,000 in charges to the Plan for Plan Member 1, but ABA Florida never collected even a dollar from Plan Member 1. (DE [9] ¶ 20 n.6).

ABA Georgia engaged in the same scheme. *Id.* ¶ 23. ABA Georgia submitted a bill of $3,960.00 for services provided to Plan Member 2 on May 17, 2024. *Id.* ¶ 23-24. But ABA Georgia did not collect—nor intend to collect—the required amounts from Plan Member 2. In May and June of 2024, ABA Georgia collected $200 from Plan Member 2, while in that same period, the billed charges showed that Plan Member 2 paid $1,000 deductible, $7,000 in co-insurance, and over $31,000 in non-allowed billed charges. *Id.* ¶ 24. The fact that ABA Georgia only collected $200 in that time period is not reflected in the Plan, so the Plan paid more than it was supposed to, and—once the out-of-pocket maximum was supposedly reached—paid the entirety of the allowed charges. *Id.* Over the course of 10 months, Plan Member 2 should have paid $214,422. *Id.* ¶ 67. But Plan Member 2 paid hardly anything.

This scheme works because ABA Centers are out-of-network with Publix and the Plan. If ABA Centers were in-network, they would have to accept a discounted price from Plaintiffs for services provided to Plan Members. But by being out-of-network, ABA Centers interact directly with Plan Members and submit bills for reimbursement to the Plan. And by charging Plan Members nearly nothing, ABA Centers frustrate the Plan's cost-sharing mechanisms. Since Plan Members will not object to ABA Centers' bills, ABA Centers can over-charge the Plan, knowing that the higher the billed charges, the more Plaintiffs will pay ABA Centers. *Id.* ¶ 25.

Compared to in-network providers, ABA Centers' bills are grossly inflated. For services that Publix pays in-network providers $88 an hour, ABA Centers bill $4000 an hour. *Id.* ¶ 27. This is only possible because Members never dispute their bills, since they actually do not pay more than a *de minimis* monthly fee. *Id.* Again by way of

example, on February 22, 2023, ABA Centers billed Member 1 $8,600 for a two-hour session. *Id.* ¶ at 77. ABA Centers billed Member 8 at $8,415 for two hours on April 12, 2024 and Members 3, 9, and 5 at $9,900 for two hours on March 10, 2024, May 30, 2024, and June 8, 2024 respectively. *Id.* And these were all for services that in-network providers charge $88 an hour.

ABA Centers also bill $1000 an hour for non-medically necessary activities, like taking children to the movies, amusement parks, or other recreational activities. *Id.* ¶ 32. Some former employees described ABA Centers asking parents to take an ABA Centers' behavioral therapist to activities even if the therapist would only watch and would not participate at all. *Id.* ¶ 38. This way ABA Centers could still bill. *Id.*

ABA Centers would let Plan Members decide how much to pay, regardless of how much their co-pay or deductible would have been. ABA Florida told Plan Member 4 that ABA Centers would charge him a monthly payment, but ABA Florida allowed him to choose his payment from a range of $100-300. *Id.* ¶ 70. Member 4 obviously chose to pay $100. *Id.* But the reality was that Member 4's financial obligations over the course of 10 months, based on ABA Florida's bills, should have exceeded $300,000.[2] *Id.* ABA Florida asked Plan Member 5 how much she wanted to pay, and she chose $50 a month. *Id.* ¶ 71. But her bills totaled $290,000 over the course of ten months in 2024. *Id.* Plan Member 6 paid ABA Florida $100 a month, but based on the bills, her obligations were $580,000 for that ten month period. *Id.* ¶ 72. When Plan Member 7 offered to pay ABA Florida $50 a month, the representative suggested Plan Member 7 pay less, explaining that some Plan Members paid as little as $10 a month. *Id.* ¶ 73. When Plan Member 7

[2] When Member 4's financial obligations under the plan totaled $30,000 a month, $100 is truly *de minimis*.

asked how ABA Centers would get paid when collecting so little, ABA Florida reassured Member 7 that ABA Centers received money from the Plan for being out of network. *Id.* Plan Member 7's obligations amounted to $230,000 in 2023. *Id.* ABA Georgia accepted $100 a month from Plan Member 2, but over ten months in 2024, Member 2's bills totaled more than $200,000. *Id.* ¶ 74. For these Members, there were no co-pays, no deductibles, no consideration of out-of-pocket maximums. Instead, they only had to pay their $100 per month (at most) fee, and ABA Centers collected the rest from Plaintiffs.

Plaintiffs documented ABA Florida's and ABA Georgia's charges for each member, along with the dates, claim codes, check numbers, and the amounts Plaintiffs actually paid for each charge. (DE [9-1], [9-2]) (charts for both ABA Florida and ABA Georgia).

Plaintiffs sued Defendants ABA Florida and ABA Georgia in the United States District Court for the Middle District of Florida. The case was transferred to the Southern District of Florida. In their Amended Complaint, Plaintiffs bring nine claims: violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") (Count I); RICO conspiracy (Count II); fraud in billing practices (Count III); negligent misrepresentation and omission (Count IV); unjust enrichment (Count V); violations of Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") (Count VI); equitable and declaratory relief under the Employee Retirement Income Security Act ("ERISA") (Count VII);[3] declaratory judgment (Count VIII); and tortious interference with a contract (Count IX).

Defendants filed a Motion to Dismiss Plaintiffs' Amended Complaint (DE [49]), Plaintiffs filed a Memorandum of Law in Opposition (DE [52]), and Defendants filed a Reply in Further Support of Motion to Dismiss (DE [55]). The Motion to Dismiss (DE [49])

[3] Count VII was brought only by Publix, and not the Plan.

is ripe for the Court's review. The Court grants the Motion to Dismiss as to Counts VI, VII, and VIII and denies the Motion as to all other Counts.

## II. LEGAL STANDARDS

At the pleading stage, a complaint must contain "a short and plain statement of the claim showing the [plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a). Although Rule 8(a) does not require "detailed factual allegations," it does require "more than labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[A] formulaic recitation of the cause of action will not do." *Id.* To survive a motion to dismiss, "factual allegations must be enough to raise a right to relief above the speculative level" and must be sufficient "to state a claim for relief that is plausible on its face." *Id.* at 555. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

When a plaintiff is "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Rule 9(b). "Rule 9(b) may be satisfied if the complaint sets forth: (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants 'obtained as a consequence of the fraud.'" *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1371 (11th Cir. 1997) (quoting *Fitch v. Radnor Industries, Ltd.*, 1990 WL 150110, at *2 (E.D.Pa. Sept. 27, 1990)).

In considering a Rule 12(b)(6) motion to dismiss, the court's review is generally "limited to the four corners of the complaint." *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009) (quoting *St. George v. Pinellas Cty.*, 285 F.3d 1334, 1337 (11th Cir. 2002)). Courts must review the complaint in the light most favorable to the plaintiff, and must generally accept the plaintiff's well-pleaded facts as true. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1057 (11th Cir. 2007). However, pleadings that "are no more than conclusions are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679.

III. DISCUSSION

A. Rule 9 and the Fraud Counts

Defendants first argue that the fraud-related counts, Counts I, III, IV, V, and VI, should be dismissed for not being pled with specificity under Rule 9(b). Essentially, Defendants assert that the Amended Complaint fails to sufficiently allege the who, what, when, where, and how of its fraud claims. But that is not the case. The Amended Complaint satisfies the *Brooks* factors. *See Brooks*, 116 F.3d at 1371. Plaintiffs allege that ABA Florida and ABA Georgia knowingly misled Plaintiffs by submitting inflated bills. ABA Florida and ABA Georgia declined to collect from Plan Members the amounts that Plan Members owed under the Plan. (DE [9] ¶ 70-74). But ABA Florida and ABA Georgia never informed Plaintiffs that it was not collecting from Plan Members. *See id.* ¶ 22. Plaintiffs allege that ABA Florida and ABA Georgia inflated each bill, knowing that Plan Members would not object and that Plaintiffs would pay their obligated portion of the inflated bill, believing the total to be the actual total that ABA Centers collected from both

Plaintiffs and Plan Members. *Id.* ¶ 20-24, 58. By not disclosing that Plan Members were not paying their required amounts, ABA Centers inflated their bills and induced Plaintiffs to pay significantly more than Plaintiffs actually owed. *Id.* ¶ 58.

Plaintiffs allege that each billed charge was a misrepresentation, because each bill was supposed to be a total that *both* Plan Members and Plaintiffs were paying, when in reality, only Plaintiffs paid and ABA Centers never collected the full amount. The total for each charge was false, because ABA Centers never intended to collect that amount. In their attached exhibits, Plaintiffs provide detailed information for each charge from both ABA Florida and ABA Georgia, including the date, the charged amount, the amount that Publix paid, and the check number. (DE [9-1], [9-2]). Plaintiffs also allege that representatives from ABA Florida told specific Plan Members that they could pay as little as $10 to $100 a month. (DE [9] ¶ 70-73). The exhibit charts provide the specifics of each misrepresentation.

Plaintiffs allege the "who"—ABA Florida and ABA Georgia; the "what"—intentionally misrepresented bills to induce Plaintiffs to overpay for services; the "when"—on each date that ABA Centers submitted a billed charge to Plaintiffs; the "where"—through the wires when submitting the fraudulent bills to the Plan;[4] and the "how"—made Plaintiffs believe that the total charge was significantly higher than it actually was by neglecting to disclose that ABA Centers did not meaningfully collect from Plan Members. Plaintiffs have specifically pled their fraud claims and satisfy Rule 9(b).

[4] If these allegations are true, and the Court must assume they are at this stage of the proceedings, the use of the wires to engage in these acts implicates 18 U.S.C. § 1343 and supports multiple counts of wire fraud. This is of course in addition to state criminal liability under Fla. Stat. § 817.234(1)(a) for insurance fraud.

B. Plaintiffs State a Claim: Counts I, II, III, IV, V, and IX

Defendants next argue that Plaintiffs fail to state a claim for relief. But Plaintiffs do state a claim in Counts I, II, III, IV, V, and IX. Starting with Count I, Defendants' main argument is that Plaintiffs do not comprise an "enterprise" for RICO purposes that is distinct from their own corporate structure. Defendants argue that ABA Florida and ABA Georgia are part of the same corporate conglomerate and cannot be both the persons and the enterprise under 18 U.S.C. § 1862(c). But corporate subsidiaries may be both persons and part of the enterprise when the subsidiaries are distinct corporations incorporated in separate states with separate business operations and customer bases. *United States v. Goldin Indus., Inc.*, 219 F.3d 1271 (11th Cir. 2000). In *Goldin*, the Court asked whether each subsidiary was "free to act independently and advance its own interests." *Id.* Here, ABA Florida and ABA Georgia are separate entities, and each "controls all material aspects of its behavior therapy businesses, including claims submissions and billings." (DE [9] ¶ 5). They are distinct organizations, and based on Plaintiff's allegations, they can be both the persons and part of the greater conspiracy enterprise of ABA Center entities under § 1862(c). Plaintiffs also allege that ABA Florida and ABA Georgia participated in the operation and management of the RICO enterprise. This claim may proceed.

For Count II's RICO conspiracy claim, Defendants argue that Plaintiffs do not allege the Defendants made an agreement to engage in racketeering. According to Defendants, Plaintiffs only allege the Defendants engaged in parallel conduct with each other. But parallel conduct can show a conspiracy if it is "placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well

be independent action." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1294 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 557). Here, Plaintiffs allege that ABA Florida and ABA Georgia both submitted inflated bills to Plaintiffs when neither ABA Florida nor ABA Georgia intended to collect any significant portion from Plan Members. This alleged conduct is not normal business practice that both entities coincidentally engaged in, but was instead intentional and methodical fraudulent activity in and of itself. ABA Florida and ABA Georgia were hardly likely to both decide to submit inflated bills and not collect from Plan Members at the same time without a prior agreement. Plaintiffs have sufficiently alleged a conspiracy.

For Counts III and IV, Defendants argue that Plaintiffs did not rely on any misrepresentations made by ABA Centers and that ABA Centers owed no duty to disclose omissions. Both arguments fail. First, Plaintiffs clearly alleged that both Publix and the Plan relied on ABA Center's billed amount to be the total amount collected. Both Publix and the Plan made payments based on the misrepresentations, as ABA Centers intended. Second, in the health insurance context, a "defendant has a duty to disclose 'where a defendant's failure to speak would render the defendant's own prior speech misleading or deceptive.'" *State Farm Mut. Auto. Ins. Co. v. Performance Orthopaedics & Neurosurgery, LLC*, 2018 WL 2186496, at *11 (S.D. Fla. Feb. 16, 2018) (quoting *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1206 (11th Cir. 2001)). ABA Centers knew that Plaintiffs relied on ABA Centers to collect the full amount owed by Plan Members when Plaintiffs calculated how much of the bill Plaintiffs owed. ABA Centers owed a duty to disclose that it was not collecting the full amount from Plan Members. Counts III and IV may proceed.

Defendants urge the Court to dismiss Count V because unjust enrichment is not available as an equitable remedy when other remedies in law are available to address the same factual predicate. But under Florida law, unjust enrichment can be pled alongside legal causes of action so long as the plaintiff is not alleging there was an express contract between the parties. *In re Horizon Organic Milk Plus DHA Omega-3 Mktg. & Sales Prac. Litig.*, 955 F. Supp. 2d 1311, 1337 (S.D. Fla. 2013). Here, all of Plaintiffs' claims sound in tort, not contract, and Plaintiffs do not allege an express with contract with ABA Centers.

Turning to Count IX, Defendants assert that Plaintiffs do not state a claim for tortious interference with a contract because Plaintiffs do not specify which specific contractual relationships Defendants interfered with. Defendants also argue that the claim here fails because tortious interference requires defendants to be strangers to the business relationship, as otherwise—if defendant is connected to the business relationship—the interference may be justified. Again both arguments fail. Plaintiffs do specify contractual relationships that Defendants interfered in. Plaintiffs allege that they had a contractual relationship with Plan Members 2, 4, 5, 6, and 7, where they agreed to pay certain percentages of their bills, but ABA Centers interfered and lied to Plan Members 2, 4, 5, 6, and 7, saying that they could pay as little as $10 to $100 a month. (DE [9] ¶ 23 n.7, 70-74). This interference would make Defendants' plan more attractive to an insured than an "honest" plan which would require a greater payment from each plan member. And so, it's a classic tortious interference allegation in that the scheme influences a contract based on a lie, to Plaintiff's detriment.

Regarding Defendants' next argument, under Florida law a defendant's interference may be unjustified even if the defendant is connected to the relationship if the defendant used "improper methods" when interacting with the other contracting parties. *KMS Rest. Corp. v. Wendy's Int'l, Inc.*, 361 F.3d 1321, 1325, 1327 (11th Cir. 2004). Here, ABA Centers made intentional misrepresentations to both Plaintiffs and Plan Members, improperly interfering with their relationship. This claim may proceed.

C. <u>Plaintiffs Failed to State a Claim: Counts VI, VII, and VIII</u>

In Count VI, Plaintiffs allege that they are consumers under FDUTPA and they were injured by Defendants' unfair and deceptive business practices. Defendants point out that Plaintiffs are not consumers. They provide services to consumers. In Plaintiffs' response, Plaintiffs appear to abandon their allegation that they are consumers and instead argue that their *per se* FDUTPA claim does not require proof of consumer harm.

"The elements of a FDUTPA claim are '(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages.'" *Pop v. LuliFama.com LLC*, 145 F.4th 1285, 1295 (11th Cir. 2025) (quoting *City First Mortg. Corp. v. Barton*, 988 So. 2d 82, 86 (Fla. 4th DCA 2008)). A plaintiff "does not have to be a consumer to bring" a FDUTPA claim, but the plaintiff does "have to prove that there was an injury or detriment to consumers in order to satisfy all of the elements of a FDUTPA claim." *Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cnty., Inc.*, 169 So. 3d 164, 169 (Fla. Dist. Ct. App. 2015) (emphasis removed). Plaintiffs argue that harm to a consumer is part of the first factor, which they claim can be satisfied without showing harm to a consumer. To support this contention, Plaintiffs cite to *Caribbean Cruise*. But *Caribbean Cruise* explicitly forecloses this—plaintiffs "have to prove that there was an injury or detriment to

consumers in order to satisfy *all* of the elements of a FDUTPA claim." Plaintiffs cannot sidestep this requirement. Here, Plaintiffs do not show an injury to consumers. The consumers, the Plan Members, *benefitted* from ABA Centers' fraudulent acts. Plaintiffs do not state a claim under FDUTPA.

Count VII is a claim for restitution under ERISA, 9 U.S.C. § 1132(a)(3). To be actionable under § 1132(a)(3), a claim must be "equitable—the imposition of a constructive trust or equitable lien on particular property" and not "legal—the imposition of personal liability for the benefits that [plaintiffs] conferred upon [defendants]." *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 214 (2002). "Under *Knudson*, . . . the most important consideration is . . . that the settlement proceeds are still intact, and thus constitute an identifiable *res* that can be restored to its rightful recipient." *Admin. Comm. for Wal-Mart Stores, Inc. Associates' Health & Welfare Plan v. Horton*, 513 F.3d 1223, 1229 (11th Cir. 2008). Here, Plaintiffs' claim that the funds are traceable because Plaintiffs can identify the check numbers for each payment Plaintiffs made in reliance on Defendants' misrepresentations. But that is not sufficient to prove traceability under *Knudson*. Rather, the funds must be "intact." *Wal-Mart*, 513 F.3d at 1229. Plaintiff does not allege that ABA Florida and ABA Georgia have kept the funds at issue here separated from other funds. Traceability is especially a problem here because Plaintiffs provided the funds to Plan Members who then in turn passed the payments on to ABA Centers. The funds at issue are not traceable, so restitution under ERISA is not available. Count VII is dismissed.

Finally, Count VIII fails to state a claim. The Declaratory Judgment Act provides that "any court of the United States, upon the filing of an appropriate pleading, may

declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Courts are afforded "ample discretion" on whether to entertain a declaratory judgment action. *Taylor v. Greene*, 2010 WL 5248502, at *3 (S.D. Fla. Dec. 16, 2010) (citing *Kerotest Manufacturing, Co. v. C–O–Two Fire Equipment Co.*, 342 U.S. 180, 183–84 (1952) ("an ample degree of discretion, appropriate for disciplined and experienced judges, must be left to the lower courts" in their decision to adjudicate declaratory judgment claims)). "Moreover, a declaratory judgment serves to clarify the legal relations and is not for the purpose of making factual determinations." *Id.*

The Declaratory Judgment Act "permits actual controversies to be settled before they ripen into violations of law or a breach of contractual duty." *Sierra Equity Grp., Inc. v. White Oak Equity Partners, LLC*, 650 F. Supp. 2d 1213, 1230 (S.D. Fla. 2009) (citing 10B C. Wright & A. Miller, Federal Practice & Procedure, Civil 3d § 2751 (2004)). "Indeed, the purpose of the Declaratory Judgment Act is to clarify the legal relations at issue and to settle controversies prior to a legal breach of duty or contract." *Id.*

Here, Plaintiffs seek a declaratory judgment as to whether Plaintiffs must pay Defendants for submitted claims that Plaintiffs have declined to pay. But Plaintiffs are also alleging Defendants already breached their duties. Declaratory judgments settle controversies before a tort is committed. Here, a tort has already been allegedly committed. Resolving Plaintiffs' legal claims will clarify whether Plaintiffs need to pay Defendants for any pending bills in the future. The Court does not need to issue a declaratory judgment to resolve that prospective issue. In the Court's discretion, this claim is dismissed.

IV. CONCLUSION

Plaintiffs have stated a claim for RICO violations, conspiracy to commit RICO violations, fraud, negligent misrepresentations, unjust enrichment, and tortious interference with a contract. As Plaintiffs have alleged the facts, Defendants ABA Centers have engaged in criminal conduct. This civil case may proceed. Accordingly, it is hereby

**ORDERED AND ADJUDGED** as follows:

1. Defendant's Motion to Dismiss (DE [49]) is **GRANTED IN PART** and **DENIED IN PART**.
2. Counts VI, VII, and VIII are **DISMISSED WITHOUT PREJUDICE.**

**DONE AND ORDERED** in Chambers, Fort Lauderdale, Florida, this 28th day of August 2026.

RAAG SINGHAL
UNITED STATES DISTRICT JUDGE

Copies furnished counsel via CM/ECF